UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| HEALTH CARE FACILITIES, PARTNERS, LLC, *et al.*, | CASE NO.  5:21-cv-1070 |
| Plaintiffs, | JUDGE BRIDGET M. BRENNAN |
| v. | |
| JACK DIAMOND, *et al.*, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

Before the Court is Defendant Jack Diamond's Motion to Dismiss Plaintiffs' Amended Complaint for Lack of Subject Matter Jurisdiction.  (Doc. No. 72.)  For the reasons stated herein, that motion is DENIED.

**I.  Background**

The Court limits this summary to facts and procedural history necessary to analyze Diamond's motion to dismiss.

    **A.  Plaintiffs' Factual Allegations**

Plaintiffs were separate, unaffiliated limited liability companies engaged in the ownership, development, operation, and management of various medical facilities throughout the United States. (Am. Compl., Doc. No. 68 at ¶ 1.)  Each entity was formed on a project-by-project basis by a group of investors that operated under either the "Health Care Facilities Partners" ("HCFP") or "Surgical Development Partners" ("SDP") brands.  (*Id.*)  While Plaintiffs' names generally included the "HCFP" or "SDP" moniker, Plaintiffs' respective ownership varied by entity.  (*Id.*)  There was no single "holding" company that owned any direct or indirect interest in each Plaintiff.  (*Id.* at ¶ 47.)

Plaintiffs worked with physicians and hospitals throughout the United States "to provide

1

professional advisory services, including medical center development services, hospital advisory services, and ambulatory surgery center development and management." (*Id*. at ¶ 45.) Plaintiffs' members and managers often invested in centers they managed through special purpose entities formed to hold the project-specific investments. (*Id.*) When new opportunities became known, the investor group directed Health Care Facilities Partners, LLC, Health Care Facilities Partners Administration, LLC, and/or HCFP, LLC (collectively, the "HCFP Administration") to execute a non-disclosure agreement to facilitate exploration of the opportunity. (*Id.* at ¶ 46.) Once the initial confidential due diligence occurred, individuals interested in pursuing the project typically formed a new project-specific entity for the opportunity. (*Id.*) Entities formed to manage a particular business center (a "Management Business") generally include the term "Enterprises" in their name. (*Id.*) Entities formed to hold equity investments (an "Investment Business") generally include the term "Investments" in their name. (*Id.*) Once formed, these standalone Management Businesses and Investment Businesses communicated directly with any necessary third parties to carry out their center-specific business needs. (*Id.*)

Diamond invested in some, but not all, of the HCFP and SDP-branded projects. (*Id.* at ¶ 2.) Diamond was also an appointed manager of many of the businesses. In that role, he was responsible for managing business operations. (*Id.*) Diamond personally guaranteed many loans for the HCFP and SDP projects. (*Id.* at ¶ 3.) Diamond, along with his law firm Brennan, Manna, & Diamond, also served as outside counsel for Plaintiffs on transactional matters. (*Id.* at ¶ 2.) Diamond was a member of each Plaintiff, except HCFP of Brainard Investments, LLC, HCFP of Brainard Enterprises, LLC, HCFP of SW Ohio Investments, LLC, HCFP of SW Ohio Enterprises, LLC, and HCFP, LLC. (*Id.* at ¶ 50.)

Plaintiffs regularly entered into confidential, commercially sensitive business negotiations

and transactions with health systems and provider partners throughout the county. (*Id.* at ¶ 52.) These deals derived economic value from their non-public status, particularly during the negotiation stage, as other companies competed for these opportunities to develop or manage medical facilities. (*Id.*) Plaintiffs maintained trade secrets related to the centers owned and operated by the Management Businesses and Investment Businesses, including non-public information related to contractual terms, strategic plans, financial information, and information related to physicians employed by the centers. (*Id*. at ¶ 56.) Plaintiffs protected the confidentiality of this information, including through non-disclosure agreements. (*Id.*)

Plaintiffs' development projects, called Pipeline Deals, also involved trade secrets and confidential information. (*Id.* at ¶ 54.) During 2020, the COVID-19 pandemic emphasized the need for the development of medical centers. (*Id.* at ¶ 53.) Plaintiffs spent months working to secure existing partnerships and develop new opportunities. (*Id.*) Plaintiffs developed a robust pipeline of new prospective business ventures through which they were (and in some cases remain) poised to provide facility development and management services. (*Id.* at ¶ 54.) These included the development of multiple new ambulatory surgery centers and two tax-exempt bond funded medical facilities. (*Id.*) The deals were confidential in order to prevent disclosure to competing healthcare companies. (*Id.* at ¶¶ 54-55.) Plaintiffs protected this information through, *inter alia,* non-disclosure agreements. (*Id.* at ¶ 55.)

Plaintiffs sought to reduce debt, so they entered into confidential negotiations with a public company to form a joint venture to develop and manage additional medical centers (the "Joint Venture"). (*Id.* at ¶ 4.) The terms of the Joint Venture were sufficiently sensitive as to constitute trade secret information protected with non-disclosure agreements. (*Id.* at ¶ 58.)

Diamond was privy to Plaintiffs' confidential and trade secret information. (*Id.* at ¶ 59.) As

they were finalizing the terms of the Joint Venture, Diamond allegedly sabotaged the Joint Venture by surreptitiously assigning his interests in certain entities to one of Plaintiffs' competitors called Value Health. (*Id.* at ¶ 5.) Diamond effectively exchanged his stake in certain Plaintiffs for a stake in Value Health, coaxed by a promise from the latter to indemnify Diamond. (*Id.*) Plaintiffs allege that Diamond thereby abused his position to obtain and disclose to Value Health Plaintiffs' trade secret information. (*Id.* at ¶¶ 59, 61.) As a result, Value Health has demanded more highly confidential information about Plaintiffs' projects, sought a controlling stake in the business, and caused the Joint Venture partner to back out. (*Id.* at ¶¶ 6-7.) Plaintiffs allege that these are some of the consequences of Diamond's disclosure of trade secrets and confidential information to Value Health. (*Id.* at ¶¶ 68-77.)

### B. Relevant Procedural History

Plaintiffs filed their complaint on May 24, 2021. (Doc. No. 1.) Diamond filed his answer and counterclaims against Plaintiffs on July 6, 2021. (Doc. No. 44.) Plaintiffs answered Diamond's counterclaims on July 27, 2021. (Doc. No. 47.) Shortly thereafter, Plaintiffs dismissed Value Health from this lawsuit on August 13, 2021. (Doc. No. 49.) Plaintiffs then sought leave to amend their complaint, which the Court granted, and filed their amended complaint on November 12, 2021. (Doc. No. 68.) On November 22, 2021, Diamond answered Plaintiffs' amended complaint and filed a motion to dismiss for lack of subject matter jurisdiction. (Doc. Nos. 70, 72.) On December 6, 2021, Plaintiffs answered Diamond's counterclaims. (Doc. No. 74.) Plaintiffs then opposed Diamond's motion to dismiss on December 22, 2021. (Doc. No. 84.) Diamond replied in support on January 10, 2022. (Doc. No. 88.)

## II. Law and Analysis

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) allows dismissal for "lack of jurisdiction over the subject matter" of claims asserted in the complaint. Fed. R. Civ. P. 12(b)(1).

> Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties. A *facial* attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading. In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss. On the other hand, when a court reviews a complaint under a *factual* attack, as here, no presumptive truthfulness applies to the factual allegations. . . . When facts presented to the district court give rise to a factual controversy, the district court must therefore weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist. In reviewing these speaking motions, a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts.
>
> * * *
>
> A dismissal under 12(b)(1) allows for the possibility of repleading the action to bring it within the subject matter jurisdiction of some court. The *res judicata* effect of a 12(b)(1) motion is consequently limited to the jurisdictional issue. In contrast, a grant of summary judgment resolves the issue on the merits and is with prejudice.

*Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (citations omitted). "Plaintiff bears the burden of establishing that subject matter jurisdiction exists." *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014) (citation omitted).

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, the pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court

5

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556); *see also dlhBOWLES, Inc. v. Jiangsu Riying Elecs. Co.*, No. 5:21-CV-170, 2022 WL 36465, at *6 (N.D. Ohio Jan. 3, 2022) (resolving motion to dismiss patent claim). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

"When determining whether [plaintiff's] complaint meets this standard 'we accept as true its factual allegations and draw all reasonable inferences in his favor, but we disregard any legal conclusions.'" *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)). The Court "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). "The plausibility of an inference depends on a host of considerations, including common sense . . . .'" *Ryan*, 979 F.3d at 524 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013)); *see also Gold Crest, LLC v. Project Light, LLC*, 525 F.Supp.3d 826, 833-34 (N.D. Ohio 2021).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original)). In such a case, the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [and the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. "While a complaint need not set down in detail all the particulars of a plaintiff's claim, 'Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'" *Gold Crest*, 525 F.Supp.3d at 834 (quoting *Iqbal*, 556 U.S. at 678–79 ("Threadbare recitals of the

6

elements of a cause of action, supported by mere conclusory statements, do not suffice.")).

### B. Nature of the Motion

Diamond raises a facial attack on this Court's jurisdiction. (*See* Doc. No. 72-1 at PageID# 530 ("The facts relied upon in this Motion to Dismiss come entirely from the Amended Complaint."); Doc. No. 88 at PageID# 659 (describing the motion "as a 'facial attack'").) He argues that the Amended Complaint fails to state a viable claim under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"). Because the remainder of the pendent claims are based on state law, Diamond contends that the entire basis for federal subject-matter jurisdiction here rises or falls with the DTSA claim. (*Id.* at PageID# 529-30.) In short, if the DTSA claim cannot survive Diamond's Rule 12(b)(6) challenge, then he asks the Court to dismiss the entire action under Rule 12(b)(1).

Diamond asserts that the DTSA provides a cause of action for the owner of a trade secret that has been misappropriated "if the trade secret is related to a **product** or a **service** used in, or intended for use in interstate [or] foreign commerce." (Doc. No. 72-1 at PageID# 532 (emphasis in original).) Diamond argues generally that Plaintiffs' complaint is devoid of allegations connecting Plaintiffs' trade secrets to a service used in interstate commerce, and that the trade secrets do not relate to a service at all. (*Id.* at PageID# 534.) In opposition, Plaintiffs argue that they have pleaded the requirements of the DTSA by demonstrating that their services are used in interstate commerce and that their trade secrets relate to those services. (Doc. No. 84 at PageID# 620-22.)

As an initial matter, the parties disagree on whether this motion should be classified as a Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction or a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim. Plaintiffs assert that Diamond's motion is a "Rule 12(b)(6)-style attack on the sufficiency of Plaintiffs' DTSA allegations more generally" and

that he has waived such an attack by filing an answer ahead of this motion. (Doc. No. 84 at PageID# 632.) Diamond responds by asserting that this is not a motion to dismiss for failure to state a claim, but rather a "facial attack" of subject matter jurisdiction. (Doc. No. 88 at PageID# 659.)

Under these circumstances, 12(b)(1) versus 12(b)(6) is a distinction without a difference. Diamond expressly challenges the Amended Complaint on its face, and neither side relies on evidence outside the pleading. The DTSA claim is the basis for federal question jurisdiction under 28 U.S.C. § 1331 in this case, according to the Amended Complaint. (Doc. No. 68 at ¶ 37.) Plaintiff alleges that the remainder of the claims come within the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

As such, if the DTSA cause of action in Count II fails to state a claim and warrants dismissal under Rule 12(b)(6), then the entire action may be dismissed under Rule 12(b)(1). Other courts have dismissed DTSA claims for lack of subject-matter jurisdiction upon finding the interstate-commerce element lacking. *See, e.g., Gov't Emps. Ins. Co. v. Nealey*, 262 F.Supp.3d 153, 172 (E.D. Pa. 2017) (collecting cases); *Islands Hospice, Inc. v. Duick*, No. 19-CV-00202, 2019 WL 4620369, at *3 (D. Haw. Sep. 23, 2019).

### C. The DTSA

The DTSA requires a plaintiff to plead: (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce," *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id.* § 1839(5). *Oakwood Lab's LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (citing 18 U.S.C. §

8

1836(b)(1), (3)).

> [I]nformation alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it. But a plaintiff need not spell out the details of the trade secret to avoid dismissal. Rather, the subject matter of the trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies. Beyond those outer boundaries, however, deciding whether a plaintiff has sufficiently disclosed its trade secrets is a fact-specific question to be decided on a case-by-case basis.

*Oakwood Lab's*, 999 F.3d at 906 (quotations and citations omitted).

### 1. The Alleged Trade Secrets

"In order to plead a claim for violation of the DTSA, a plaintiff must allege that it lawfully owned information of independent economic value that it took reasonable measures to keep secret, and that the defendant under consideration either acquired, disclosed, or used, improperly." *ATS Group, LLC v. Legacy Tank & Industrial Services LLC*, 407 F.Supp.3d 1186, 1197 (W.D. Okla. 2019); *see also Manville & Schell, P.C. v. Stricker*, No. 1:19-CV-281, 2020 WL 7049356, at *3 (W.D. Mich. Aug. 21, 2020), *report and recommendation adopted in pertinent part and rejected in part on other issues by*, No. 1:19-CV-281, 2020 WL 6375397 (W.D. Mich. Oct. 30, 2020).

> Here is how Plaintiffs pled regarding their purported trade secrets:
>
> 52. As part of their business, Plaintiffs regularly enter into confidential, commercially sensitive business negotiations and transactions with health systems and provider partners across the country, the details of which are non-public. By their very nature, these deals derive economic value from their non-public status, particularly during the negotiations stage, as numerous other healthcare companies compete for these valuable opportunities to develop and/or manage medical facilities. Plaintiffs thus make strong efforts to protect information about their respective businesses.
>
> 53. Throughout 2020, with COVID-19 looming over the industry and the economy as a whole, development of new medical centers was critical to Plaintiffs' chances for continued success. To that end, Plaintiffs spent months working to secure their existing partnerships and to develop new business opportunities.

> 54. By mid-2020, Plaintiffs' efforts had begun to pay off, as Plaintiffs had developed a robust pipeline of promising new prospective business ventures through which they were, and in some cases still are, in line to provide facility development and management services (the "Pipeline Deals"). The Pipeline Deals include, but are not limited to, multiple new ambulatory surgery centers and two tax-exempt bond funded medical facilities. The details regarding these opportunities are confidential.
>
> 55. By their very nature, these Pipeline Deals derive economic value from their non-public status, particularly during the negotiation and pre-opening stages, as numerous other healthcare companies compete with Plaintiffs for these valuable opportunities. To protect this valuable information, HCFP Administration and/or a project-specific entity (depending upon the stage of the particular deal) has signed non-disclosure agreements for each Pipeline Deal which, once consummated, will be housed within its own project-specific, special purpose entity.
>
> 56. In addition to information about the Pipeline Deals, Plaintiffs also own trade secrets related to the centers operated and owned by the Management and Investment Businesses. These trade secrets include non-public information related to the contractual terms associated with the centers, the strategic plans for the centers, financial information for the centers, and information related to the physicians who practice at the centers. Plaintiffs protect the confidentiality of this information, including by ensuring that all such information is covered by non-disclosure agreements.
>
> 57. Were the confidential information covered by these non-disclosure agreements disclosed to third parties, other players in the highly competitive healthcare space could swoop in and steal opportunities from those Plaintiffs who had already invested material amounts of time and money in their development or, at a minimum, cause Plaintiffs to have to re-negotiate the terms of their deals to overcome those being offered by the third parties.
>
> 58. In addition, the existence and terms of Plaintiffs' long-planned Joint Venture constituted trade secret information that was protected by non-disclosure agreements. Such information included the very prospect that the Joint Venture partner was willing to combine with Plaintiffs and/or another healthcare company, the financial terms of the planned Joint Venture, the structure of the combined Joint Venture, and information related to the center-specific projects that the Joint Venture planned to operate following the closing of that deal.

(Doc. No. 68 at PageID# 477-79.)

The motion does not dispute that these matters were kept confidential or that they could qualify as trade secrets. Diamond contends that the Amended Complaint fails to plead the second and third elements of a DTSA claim. (*See* Doc. No. 72-1 at PageID# 532-36.)

### 2.  Relation to Interstate Commerce

One author has described the second element of a DTSA claim as having two facets.  "The first is the 'Nexus Requirement,' which requires that a product or service is 'used in' 'interstate commerce.'  The second, the 'Relationship Requirement,' requires that the trade secret is 'related to' the product or service."  C. Tucker, *The DTSA's Federalism Problem: Federal Court Jurisdiction over Trade Secrets*, 28 Fordham Intell. Prop. Media & Ent. L.J. 1, 10 (2017).  Diamond adopts these labels.  (*See* Doc. No. 72-1 at PageID# 532.)

Several decisions indicate that satisfaction of the 'interstate commerce' requirement is necessary for a district court to have jurisdiction.  *See Officia Imaging, Inc. v. Langridge*, No. 17-CV-2228, 2018 WL 6137183, at *6 (C.D. Cal. Aug. 7, 2018) (collecting authorities).  The legislative history of the DTSA supports that conclusion:

> The new Section 1836(b) in paragraph (1) authorizes the owner of a trade secret that is misappropriated to bring a civil action in Federal court *if* the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.  *This jurisdictional nexus to interstate or foreign commerce* is identical to the existing language *required for Federal jurisdiction* over the criminal theft of a trade secret under Section 1832(a).

H.R. Rep. No. 114-529, at 9 (2016), reprinted in 2016 U.S.C.C.A.N. 195, 202 (emphases added).

Because this Court finds persuasive the body of authority cited above, the Court must be assured of its subject-matter jurisdiction.  The Court therefore rejects Plaintiffs' argument that Diamond waived the challenge made in his motion by filing an answer.  (*See* Doc. No. 84 at PageID# 626 n.4.)  *Von Dunser v. Aronoff*, 915 F.2d 1071, 1074 (6th Cir. 1990) ("The general practice among federal courts has been to permit any party to challenge (or for the court to question *sua sponte*) the existence of subject-matter jurisdiction at any time in the proceedings.  The language of Fed. R. Civ. P. 12(h)(3) suggests that courts have a positive duty to undertake the jurisdictional inquiry . . . .").

### a) Whether Plaintiffs' Services Were Used, or Were Intended to Be Used, in Interstate Commerce

A product or service relating to the trade secret must be used or intended for use in interstate commerce for the DTSA to apply.  *See, e.g.*, *Officia Imaging*, 2018 WL 6137183, at *1.  Diamond disputes that Plaintiffs have met this requirement.  (Doc. No. 72-1 at PageID# 534.)  He asserts that Plaintiffs' Amended Complaint is "devoid of any allegation that there is a nexus between a product or service of Plaintiffs that is used in or intended for use in interstate commerce." (*Id.*)  In opposition, Plaintiffs argue that Diamond incorrectly asserts the nexus requirement necessitates that the trade secrets themselves be used in interstate commerce, and instead they argue the DTSA only requires that the trade secrets relate to a service used in interstate commerce.  (Doc. No. 84 at PageID# 628.)  Plaintiffs argue that there is no dispute that their services are used in interstate commerce, as evidenced by the fact that Plaintiffs are headquartered in Brentwood, Tennessee, and operate medical centers throughout the United States.  (*Id.* at PageID# 628.)

Courts have found the nexus requirement is satisfied when a service could potentially involve multiple states.  In *Officia Imaging*, the plaintiff provided office equipment and document management services to companies in California and Nevada.  2018 WL 6137183, at *1.  There, the plaintiff asserted that it coordinated providing its products and services to its California customers through its warehouse in Nevada.  *Id.*  The court found this nexus to be sufficient to allege the service was used in interstate commerce.  2018 WL 6137183, at *8.  And in *Manville & Schell*, the court found plaintiff's service satisfied the nexus requirement where plaintiff prepared state and federal income tax returns.  2020 WL 7049356, at *3.  There, the plaintiffs alleged that the tax returns were delivered to clients using the internet to locations inside and outside of Michigan and that plaintiff prepared tax returns for clients that do business and live outside of Michigan.  *Id.*  The court found this to be sufficient to satisfy the nexus requirement.

12

Here, the Amended Complaint alleges confidential, commercially sensitive transactions with health systems and providers "across the country." (Doc. No. 68 at ¶ 52.) These deals allegedly derive their value from their confidential nature. (*Id.*) There can be no question that Plaintiffs allege that their services are provided in interstate commerce:

> Plaintiffs work with hospitals and physicians in communities *throughout the United States* to provide professional advisory services, including medical center development services, hospital advisory services, and ambulatory surgery center development and management. In addition to providing these services, Plaintiffs' members and managers often invest – and, here, invested – in the centers they manage through special purpose entities formed for the purpose of holding the project-specific investments.

(*Id.* at ¶ 45 (emphasis added).) This allegation states or implies that the "centers" referred to throughout the Amended Complaint are located in multiple states. The Plaintiff entities themselves are each organized under Ohio law and have offices in Brentwood, Tennessee. In short, the underlying business activities occur or are intended to occur in interstate commerce. (*Id.*) And the entities created to manage or hold the equity in these businesses also operate in interstate commerce. (*See id.* at ¶¶ 9-31.)

### b) Whether the Trade Secrets were Related to Plaintiffs' Services

The relationship requirement of the DTSA requires Plaintiffs' trade secrets be "related to" Plaintiffs' services. 18 U.S.C. § 1836(b). The term "related to" is construed broadly and means "to stand in some relation; to have bearing or concern; refer; to bring into association with or connection with." *See generally Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992); *see also Manville & Schell*, 2020 WL 7049356, at *4.

Diamond disputes that Plaintiffs have alleged that their trade secrets relate to a service at all because, as he argues, Plaintiffs' DTSA claim relates solely to the sale of Diamond's interest in Plaintiffs to Value Health. (Doc. No. 72-1 at PageID# 534.) Plaintiffs argue in opposition that the complaint clearly states that "the trade secret information known by Diamond **related to those**

13

***businesses and deals*** includes pro formas, management services agreements, operating agreements, syndication materials, operational checklists, information regarding economic terms of the deals, information pertaining to physicians, and other types of commercially sensitive information." (Doc. No. 84 at PageID# 631 (quoting Doc. No. 68 at ¶ 59).)

In *Manville & Schell*, the court found plaintiff satisfied the relationship requirement where the trade secrets at issue were the type of records that the plaintiff would use in preparing tax returns for its clients, which clearly related to the plaintiff's tax preparation services. 2020 WL 7049356, at *4. The Court finds the same true here. Plaintiffs' complaint explicitly alleges the trade secrets belong to the particular project-level Management and Investment Businesses and include, among other things, operating agreements, pro formas, and information pertaining to physicians. (Doc. No. 68 at ¶ 59.) These trade secrets are alleged to be integral to Plaintiffs' advisory and management services as well as Plaintiffs' procedures for ensuring equity for the various health care facilities. (*Id*. at ¶¶ 45, 52, 56.) Therefore, the Court finds Plaintiffs' complaint sufficiently alleges that their trade secrets relate to the services rendered.

### 3. Misappropriation

As to the third element: "There are three ways to establish misappropriation under the DTSA: improper acquisition, disclosure, or use of a trade secret without consent." *Oakwood Lab's*, 999 F.3d at 907-08 (citing 18 U.S.C. § 1839(5)).

Diamond's motion argues that "Plaintiffs' Amended Complaint makes clear that no trade secrets were actually disclosed to Value Health." (Doc. No. 72-1 at PageID# 535.) He goes on to argue that "Plaintiffs' Amended Complaint does not allege that Value Health somehow obtained trade secret information from Diamond . . . ." (*Id*. at PageID# 536.) That is plainly wrong, as the following was alleged:

14

> 90. Diamond misappropriated those trade secrets by providing them to Value Health to advance Diamond's own personal interests.
>
> 91. Value Health, in turn, misappropriated Plaintiffs' trade secrets, including by using information related thereto to attempt to steal Pipeline Deals and to sabotage the planned Joint Venture so as to better position itself to assert a controlling interest in Plaintiffs' businesses.

(Doc. No. 68 at PageID# 487-88 ¶¶ 90-91.)  Plaintiffs alleged that trade secrets were misappropriated and therefore pled the third element of a DTSA claim.

### III. Conclusion

Plaintiffs have sufficiently pled a claim under DTSA, which endows this Court with federal-question subject-matter jurisdiction under 28 U.S.C. § 1331.  For the reasons stated herein, Diamond's Motion to Dismiss Plaintiffs' Amended Complaint for Lack of Subject Matter Jurisdiction is DENIED.  (Doc. No. 72.)

**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

Date:  November 14, 2022