UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HEALTH CARE FACILITIES | ) | |
| PARTNERS, LLC, *et al*., | ) | Case No.  5:21-CV-1070 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| | ) | |
| JACK DIAMOND, *et al*., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Twenty-three affiliated limited liability companies filed suit against their co-founder
attorney Jack Diamond, who owned membership stakes in some of them, as well as other
defendants.  (Doc. Nos. 1 & 68.)  Diamond counterclaimed.  (Doc. No. 70.)  Diamond filed a
motion for summary judgment.  (Doc. No. 153.)  Plaintiffs filed their opposition, and Diamond
replied.  (Doc. Nos. 173 & 177.)  This Order resolves and disposes of Plaintiffs' federal law
trade secrets claim against Diamond.  As explained herein, the Court declines to exercise
jurisdiction over the remaining claims.

I.    **Facts**

The following facts relate to Plaintiffs' claim in Count II asserting a violation of the
federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

Plaintiffs are limited liability companies engaged in the ownership, development,
operation, and/or management of various medical facilities throughout the United States.  (Doc.
No. 68 at ¶ 1; Doc. No. 70 at ¶ 1.)[1]  Plaintiffs worked with physicians and hospitals "to provide

---

[1] "Judicial admissions are formal admissions in the pleadings which have the effect of
withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Barnes
v. Owens–Corning Fiberglas Corp*., 201 F.3d 815, 829 (6th Cir. 2000) (quoting *Am. Title Ins.*

professional advisory services, including medical center development services, hospital advisory services, and ambulatory surgery center development and management."  (No. 68 at ¶ 45; Doc. No. 70 at ¶ 21.)

Jack Diamond is an attorney licensed to practice law in Ohio and the CEO of defendant law firm Brennan, Manna & Diamond, LLC ("BMD").  (Doc. No. 68 at ¶ 48; Doc. No. 70 at ¶ 24; Doc. No. 96-3 at ¶ 1; Doc. No. 121-4 at PageID 1053-54.)  Diamond was a member of several limited liability companies within Plaintiffs' network of entities.  (Doc. No. 96-1 at PageID 711, n.3.)  Diamond was a member of all Plaintiffs except for HCFP of Brainard Investments, LLC, HCFP of Brainard Enterprises, LLC, HCFP of SW Ohio Investments, LLC, HCFP of SW Ohio Enterprises, LLC, and HCFP, LLC.  (Id.)  Diamond was also a manager of Health Care Facilities Partners, LLC ("HCFP") and Health Care Facilities Partnership Administration ("HCFPA").  (Doc. No. 96-3 at ¶ 3.)

HCFP and HCFPA had separate operating agreements (the "Original Operating Agreements") which contained similar terms.  (See Doc. No. 96-4; Doc. No. 96-5.)  The Original HCFP Operating Agreement was dated October 1, 2014.  (Doc. No. 96-4 at PageID 743.)  The Original HCFPA Operating Agreement was dated December 17, 2018.  (Doc. No. 96-5 at PageID 765.)  The Original Operating Agreements were silent as to the requisite member votes required to amend the agreements.  (See Doc. No. 96-4; Doc. No. 96-5.)  They also were silent with respect to members' and managers' duties of confidentiality with respect to company

---

*Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)).  "However, a statement must be 'deliberate, clear and unambiguous' and 'expressly concede . . . an alleged fact' in order to be treated as a judicial admission." *Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014) (quoting *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)).

information.  (*See id.*)

Diamond established an attorney-client relationship with a competitor called Value Health in mid-2020.  (*See* Doc. No. 96-3 at ¶ 18.)  The parties contest whether and when this relationship was disclosed to Plaintiffs.  (*See* Doc. No. 96 at PageID 712; Doc. No. 121 at PageID 1011-12.)  By early 2020, Diamond had begun exploring transferring his ownership share of HCFP and HCFPA to Value Health.  (Doc. No. 96-3 at ¶ 8.)  Diamond executed a Non-Disclosure Agreement (the "NDA") with Value Health to protect information that he provided to Value Health from being disclosed during negotiations.  (Doc. No. 96-3 at ¶ 9; Doc. No. 96-6.)  The parties contest the specifics of Diamond's relationship with Value Health.

Diamond contended that in 2019 and 2020 he indicated to the other members of HCFP and HCFPA that he had an interest in disengaging from the businesses and investments.  (Doc. No. 96-3 at ¶ 7.)  By the spring of 2020, Diamond had informed the other officers of HCFP and HCFPA, including President and CEO G. Edward Alexander, that he had spoken with Value Health about assuming his ownership interests in HCFP and HCFPA.  (*Id.* at ¶ 8.)  Diamond also provided the NDA to Alexander, and Alexander communicated with individuals at Value Health in the summer of 2020 about a possible relationship between HCFP and Value Health.  (Doc. No. 96-3 at ¶¶ 8-9.)

On October 29, 2020, Diamond and Value Health executed a Purchase Sale Agreement ("PSA") relating to transfer of his membership interests in HCFP.  (Doc. No. 96-3 at ¶ 11; Doc. No. 96-7.)  The parties amended the PSA (the "PSA Amendment") on November 4, 2020, to include Diamond's interest in HCFPA as well as Surgical Development Partners, LLC ("SDP").  (Doc. No. 96-3 at ¶ 12; Doc. No. 96-8.)

Diamond asserted that the PSA and the PSA Amendment functioned as the sale of his

membership interest in HCFP to Value Health.  (Doc. No. 96-1 at PageID 713; Doc. No. 96-3 at ¶ 11.)  Plaintiffs, however, argued that the PSA and the PSA Amendment indicated an intent to transfer Diamond's interest to Value Health provided that certain events agreed to in the PSA and the PSA Amendment occurred.  (Doc. No. 121 at PageID 1013.)

On November 12, 2020, after the execution of the PSA and the PSA Amendment, Frank Sossi, a manager of and attorney for HCFP and HCFPA, circulated amendments to the Original Operating Agreements (the "Amended Operating Agreements") for member approval.  (Doc. No. 121-26; *see also* Doc. No. 121-27; Doc. No. 121-28.)  On November 13, 2020, some, but not all, members circulated signed copies of the Amended Operating Agreements.  (*See* Doc. No. 121-27 at PageID 1186-90; Doc. No. 121-28 at PageID 1203-08.)  Specifically, John Childs, Heidi Heinle, Jack Diamond, and Value Health were not signatories to the Amended Operating Agreements.  (*Id*.)[2]

On November 21, 2020, Diamond, Childs, and Heinle executed an assignment of interests (the "Assignment") to Value Health for all their interests in the HCFP related entities.  (Doc. No. 96-3 at ¶ 16; Doc. No. 96-11.)  On November 23, 2020, all parties had signed the Assignment.  (Doc. No. 121-7 at PageID 1104 (admitting that Assignment was not signed by all parties until November 23, 2020).)  The Assignment states that it became effective on November 1, 2020.  (Doc. No. 96-10.)

Throughout the summer of 2020, Diamond began collecting information regarding the HCFP Enterprise from Alexander and Prater.  (*See, e.g.*, Doc. No. 173-19.)  In August 2020, Diamond emailed Value Health – a competitor of HCFP and a client of Diamond's – indicating

---

[2] Childs and Heinke were defendants in this action until the claims them were dismissed pursuant to the parties' joint motion.  (*See* Doc. Nos. 127 & 129.)

that he wanted no further involvement with Plaintiffs.  Diamond proposed selling his shares in Plaintiffs to Value Health.  Thereafter, he sent a series of emails through his legal assistant to Value Health.  The documents attached to those emails included operating agreements, corporate activity overviews, and financial statements.  (*See* Doc. Nos. 195-2, 195-3, 195-4, & 195-5.) Plaintiffs contend that Diamond misappropriated their trade secrets by sending this information to Value Health.  Specifically, Plaintiffs identified the Member Update presentations, the HCFP Overview presentation, the Current Projects list, and the Unaudited Financial Statements as the trade secrets disclosed through these communications.  (Doc. No. 173-2 at PageID 7390.)

During this same period of time, HCFP entered into confidential discussions concerning a potential joint venture with another entity.  This entity had a pre-existing relationship with Value Health.  By June 2020, Plaintiffs and the joint venture entity entered into a confidentiality agreement to exchange diligence materials.

On October 29, 2020, Diamond drafted, negotiated, and entered into a Purchase and Sale Agreement ("PSA") with Value Health, in which Diamond would transfer his ownership interests in HCFP in exchange for ownership in Value Health.  The agreed upon purchase price was $12.5 million, which is identical to the amount agreed to in the joint venture.

Plaintiffs claimed that they "have developed and maintained significant non-public, confidential, and proprietary information and trade secrets, including (without limitation) information relating to their existing Management and Investment Businesses, the Pipeline Deals, and the Joint Venture."  (Doc. No. 68 at ¶ 86.)  Plaintiffs argued that they protected this information, including by entering into non-disclosure agreements with existing and prospective business partners.  (*Id.* at ¶ 87.)  Plaintiffs urged that Diamond misappropriated the trade secrets by providing them to Value Health to advance his own interests.  (*Id.* at ¶ 90.)  In turn, Plaintiffs

stated that Value Health misappropriated these trade secrets, including by "using information related thereto to attempt to steal Pipeline Deals and to sabotage the planned Joint Venture so as to better position itself to assert a controlling interest in Plaintiffs' businesses."  (*Id.* at ¶ 91.)

## II.  <u>Law and Analysis</u>

### A.  Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

 "Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most

favorable to the party opposing the motion." *Id*.; *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting (or disputing) a fact must cite evidence in the record or show that the record establishes the absence (or the presence) of a genuine dispute. See Fed. R. Civ. P. 56(c) and (e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or 'weigh' conflicting evidence.  *Payne v. Novartis Pharms. Corp*., 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

### B.    The Trade Secret Claim

"Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).  "A trade secret derives its value from its secrecy.  It stands to reason, therefore, that disclosure can extinguish a trade secret and the owner's rights therein." *Houser v. Feldman*, 569 F. Supp. 3d 216, 226-27 (E.D. Pa. 2021) (quotations and citations omitted).

## 1.    The Federal DTSA

Plaintiffs brought a claim against Diamond alleging violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. ("DTSA") in Count II of the First Amended Complaint.  (Doc. No. 68 at PageID 487-88.)  "An owner of a trade secret that is misappropriated may bring a civil action under [the DTSA] if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1); *see also B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449, 2021 WL 3732313, at *5 (6th Cir. Aug. 24, 2021).

Congress set forth how information becomes a trade secret and who may enforce that under the DTSA:

> (3)  the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
> (A)  the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B)  the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;
>
> (4)  the term "owner", with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed . . . .

18 U.S.C. § 1839.  "To prevail on such a claim, a plaintiff must accordingly establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce."  *dmarcian, Inc. v. dmarcian Eur. BV,* 60 F.4th 119, 141 (4th Cir. 2023); *Noco Co. v. CTEK, Inc.*, No. 1:19-CV-00853, 2020 WL 821485, at *6 (N.D. Ohio Feb. 18, 2020).

"And, of course, each of those elements is predicated on an adequate identification of what the plaintiff contends to be its trade secret." *Mallet & Co. Inc. v. Lacayo,* 16 F.4th 364, 380-81 (3d Cir. 2021). "A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge," *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021), and "define the information for which protection is sought with sufficient definiteness," *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380-81 (6th Cir. 2022). "Though a party need not reveal its secrets in the complaint simply to prove that they exist, a party cannot get away with nebulous descriptions at the highest level of generality. A complaint that only claims general categories of information and data as trade secrets does not state a claim under the DTSA because it does not adequately put the defendant on sufficient notice of the contours of the claim for misappropriation." *A.B. Pratt & Co. v. Bridgeport Grp., LLC,* No. 1:22-CV-1579-PAB, 2023 WL 2865640, at *26 (N.D. Ohio Apr. 10, 2023) (quotations and citations omitted).

Once past the pleading stage requirement of identifying the trade secret(s) at issue, a DTSA plaintiff carries the burden of persuasion on the statutory elements. "To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist. . . . Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial. It is inadequate for plaintiffs to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (quotations and citations omitted).

Plaintiffs' burden is to show by a preponderance of the evidence that they own information which satisfies the DTSA's statutory definitions. *See generally Heartland Home*

*Fin., Inc. v. Allied Home Mortg. Cap. Corp*., 258 F. App'x 860, 861 (6th Cir. 2008).  Diamond's

summary judgment motion asserted that Plaintiffs rely on materials that do not constitute trade

secrets under the law.  (Doc. No. 166-1 at PageID 6009.)  *See generally Celotex,* 477 U.S. at 322

("the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time

for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial").  It was incumbent upon Plaintiffs to put forward evidence and

argument that show why a trade secret exists or could be proved at trial.  "Essentially, a motion

for summary judgment is a means by which to challenge the opposing party to 'put up or shut

up' on a critical issue."  *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 149 (6th Cir. 1995)

(quoting *Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1478 (6th Cir. 1989))).

The existence of a trade secret often will not be a question determinable on summary

judgment.  For example, the reasonableness or efficacy of a trade secret plaintiff's efforts to

maintain secrecy are typically left for a jury.  *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*,

521 F. App'x 453, 459 (6th Cir. 2013) (collecting authorities).  But not always.  "While it is true

that the existence of a trade secret would normally constitute a factual question, . . . some types

of information may not be a trade secret as a matter of law, and [ ] summary judgment may be

appropriate in cases where a party has failed to meet its burden of proof for the purposes of a

summary judgment motion by generating through evidentiary submissions a *genuine* issue of

material fact."  *Scott v. Snelling & Snelling, Inc*., 732 F. Supp. 1034, 1043 (N.D. Cal. 1990)

(emphasis in original; citation omitted).  If a trade secret plaintiff fails to meet the rigors of Rule

56, the Sixth Circuit has affirmed a district court's entry of summary judgment on the grounds

that there was no evidence to show that the plaintiff maintained the secrecy of the information.

*See R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 276 (6th Cir. 2010).  Moreover, the face of a document or its basic nature sometimes reveals that the document does not constitute a trade secret as a matter of law.  *E.g.*, *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004); *Novus Grp., LLC v. Prudential Fin. Inc.*, 618 F. Supp. 3d 657, 670 (S.D. Ohio 2022).

## 2.    Guidance from State Law

This Court may look for guidance in decisions addressing state trade secret law under the Uniform Trade Secrets Act ("UTSA").  "'[T]he legislative history of the DTSA shows that Congress was expressly aware of the UTSA and its structure.'  In other words, it 'was aware of the role and limitations of the UTSA as model legislation for the states, and it recognized the DTSA and the UTSA as similar."  *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 909-10 (3d Cir. 2021) (quoting *Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020)).  Courts, including this one, have used the tests fashioned around Ohio's UTSA to evaluate a federal DTSA claim.  *E.g., CTEK*, 2020 WL 821485, at *7.

Ohio law is informative and appropriate to consider in this case for several reasons.  Ohio's version of the UTSA defines a trade secret much the same as does the federal DTSA.  *Compare* Ohio Rev. Code § 1333.61(D) *with* 18 U.S.C. § 1839(3).  Plaintiff Health Care Facilities Partners, LLC is organized under Ohio law, and the Operating Agreement of that entity is governed by Ohio law.  (Doc. No. 201-3 at PageID 9656 § 8.4.)  The other plaintiff entities are organized under Ohio law.  (Doc. No. 68 at ¶¶ 9-31.)  Defendant Jack Diamond and his law firm BMD reside and do business in Ohio.  (*Id.* ¶¶ 32-36.)  Diamond's Purchase and Sale Agreement with ValueHealth, LLC also was drafted to be governed by Ohio law.  (*See* Doc. No. 44-1 at PageID 138 § 9(e).)

"A possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status, and a claimant asserting trade secret

status has the burden to identify *and demonstrate* that the material is included in categories of protected information under the statute." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999) (emphasis added).  "The Supreme Court of Ohio has articulated six factors to consider in determining whether an item constitutes a trade secret." *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019) (citing *State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 687 N.E.2d 661 (Ohio 1997)); *see also CTEK,* 2020 WL 821485 at *7.  But "it is ultimately the statute that controls the analysis, not the factors[.]" *MNM & MAK Enterprises, LLC v. HIIT Fit Club, LLC*, 134 N.E.3d 242, 249 (Ohio Ct. App. 10th Dist. 2019).

### 3.    Ownership

"Ownership is central to the DTSA [and] an essential element of a DTSA claim." *Focused Impressions, Inc. v. Sourcing Grp., LLC,* No. 19-CV-11307, 2020 WL 1892062, at *4 (D. Mass. Apr. 16, 2020) (collecting authorities).  "To state a DTSA claim, a plaintiff must show that he is the owner or licensee of the alleged trade secret." *Lamont v. Krane*, No. 5:18-CV-04327, 2019 WL 2113903, at *3 (N.D. Cal. May 14, 2019); *see also Houser*, 569 F. Supp. 3d at 228-29; 18 U.S.C. §§ 1836(b)(1) and 1839(4).

In his motion for summary judgment, Diamond argued that Plaintiffs' DTSA claim must fail because they lumped together all Plaintiffs in this count, "despite the fact that each plaintiff only has standing to pursue its own trade secrets claim."  (Doc. No. 166-1 at PageID 6008.)  He urged that Plaintiffs failed to "particularize and identify the purported misappropriated trade secret with specificity."  (*Id.* at PageID 6009 (citing *Qualite Sports Lighting LLC v. Ortega*, 1:19-CV-607, 2019 WL 7582823, at *5 (W.D. Mich. Sept. 10, 2019)).)  In response, Plaintiffs cite caselaw recognizing that trade secrets may be jointly owned.  (Doc. No. 193 at PageID 8700-01 (citing cases).)

More than one person or entity may enforce a trade secret.  One party could hold legal

title to a trade secret, while another may have equitable ownership of same.  And either of those might license the trade secret to another.  *See* 18 U.S.C. § 1839(4).  Any of these could have standing to bring a claim under the DTSA.  *See* 18 U.S.C. § 1836(b)(1).

Still, it is incumbent on each DTSA plaintiff to satisfy the plain requirements of the statute, and that means showing each plaintiff's ownership interest or license.  "The language of the DTSA limits standing to only owners and licensees."  *Phyllis Schlafly Revocable Tr. v. Cori,* No. 4:16-CV-01631, 2022 WL 898760, at *2 (E.D. Mo. Mar. 28, 2022).  To satisfy the injury-in-fact requirement for standing, the harm complained of "must be both 'concrete and particularized,' meaning 'that the injury must affect the plaintiff in a personal and individual way.'"  *Kardules v. City of Columbus*, 95 F.3d 1335, 1347 (6th Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n.1 (1992)); *see also Duncan v. Muzyn,* 885 F.3d 422, 427 (6th Cir. 2018).  Contrary to the tenor of Plaintiffs' arguments in opposition to the motion, "standing is not dispensed in gross."  *Town of Chester, N.Y. v. Laroe Ests., Inc*., 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).  "To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Id.* (quotations and citations omitted).

In response to the motion, Plaintiffs explained:

The materials provided by Diamond to Value Health in August 2020 contain trade secrets owned by several of the Plaintiff entities.  Specifically, HCFP and HCFPA's Unaudited Financial Statements contain the confidential, proprietary information of Health Care Facilities Partners, LLC and Health Care Facilities Partners Administration, LLC, and are owned by HCFP and HCFPA, respectively.  The Overview presentations, Member Update presentations, and Current Project lists contain confidential information owned by the following Plaintiffs:  Health Care Facilities Partners, LLC, HCFP of Brainard Enterprises, LLC, HCFP of Brainard Investments, LLC, HCFP of Dayton Enterprises, LLC, Surgical Development Partners of PA, LLC, HCFP of Sidney Enterprises, LLC, HCFP of Sidney Investments, LLC, HCFP of SW Ohio Enterprises, LLC, HCFP of SW Ohio Investments, LLC, HCFP of Sandusky Enterprises, LLC, HCFP of Sandusky

Investments, LLC, HCFP of Norwalk Enterprises, LLC, HCFP of Norwalk
Investments, LLC, HCFP of Celebration Enterprises, LLC, and HCFP of
Celebration Investments, LLC.

(Doc. No. 193 at PageID 8701.)

The opposition brief did not indicate any trade secret ownership for the following plaintiffs:  LRMC of Austin Investments, LLC; SDP of Austin Investments, LLC; SDP of Austin Enterprises, LLC; SDP of Dallas Holdings, LLC; HCFP of Lee County Investments, LLC; and Partners in Health Care Development, LLC.  So by Plaintiffs' own admission, these entities never had a claim because these entities were not owners or licensees, as defined in the DTSA. Accordingly, and before discussing the claim as to other Plaintiffs, Diamond's motion is granted in part – and Count II is dismissed – as to LRMC of Austin Investments, LLC; SDP of Austin Investments, LLC; SDP of Austin Enterprises, LLC; SDP of Dallas Holdings, LLC; HCFP of Lee County Investments, LLC; and Partners in Health Care Development, LLC.

### 4.    Identification of the Purported Trade Secrets

Plaintiffs identified particular documents that constitute or contain trade secret material:

The materials disclosed by Diamond to Value Health in the leadup to the execution of the PSA, including Plaintiffs' Member Update presentations, Plaintiffs' Overview presentations, Plaintiffs' Current Projects list, and HCFP and HCFPA's Unaudited Financial Statements, contain Plaintiffs' confidential, proprietary information that are Plaintiffs trade secrets.

(Doc. No. 193 at PageID 8695 (citations omitted).)  "In addition, Diamond conveyed information to Value Health about the existence and terms of Plaintiffs' confidential joint venture transaction . . . – a potential transaction that itself qualifies as a trade secret."  (*Id.* at PageID 8696.)

To qualify as a trade secret, Plaintiffs must have taken reasonable measures to maintain the secrecy of information, which garnered independent value by virtue of not being generally known or readily ascertainable by someone else who could obtain economic value from disclosure or use of the information.  *See* 18 U.S.C. § 1839(3).  Two categories of record

documents are particularly significant.  First, the Court examines materials Plaintiffs identified as *being* or *containing* the asserted trade secrets.  Second, the Court considers other cited documents and evidence that shed light on whether the asserted material does or does not meet the DTSA definitions.

### 5.      Independent Economic Value

An actionable trade secret claim exists only if "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B).  "To qualify as a trade secret, the subject-matter must meet two conditions: first, that its owner has taken reasonable measures to keep it secret, and second, that it derives independent economic value from not being known or easily ascertainable by another person who can obtain economic value from it."  *MWG Enterprises, LLC v. ETS Wound Care, LL*C, 586 F. Supp. 3d 946, 965 (E.D. Mo. 2022) (quotation omitted).  A plaintiff "bears the burden of showing that the information at issue actually [is] a trade secret, which requires showing that it 'is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy.'" *Kuryakyn Holdings, LLC v. Ciro*, LLC, 242 F. Supp. 3d 789, 798 (W.D. Wis. 2017) (quoting *IDX Sys. Corp. v. Epic Sys. Corp*., 285 F.3d 581, 583 (7th Cir. 2002)).  A trade secret plaintiff's failure to show independent economic value generally means that the information is not, as a matter of law, a trade secret.  *E.g.*, *Sarkissian Mason, Inc. v. Enter. Holdings, Inc*., 955 F. Supp. 2d 247, 258 (S.D.N.Y. 2013), *aff'd,* 572 F. App'x 19 (2d Cir. 2014).[3]

---

[3] "The economic value requirement of the UTSA was not simply a definitional flourish but was specifically designed to increase the plaintiff's burden of proof in order to ensure that a claim for relief was not provided for illusory information or information of little import."  Sharon K.

In his motion, Diamond argued that the information at issue in Count II did not have such economic value: "To be a trade secret, the material must have independent economic value. That is not the case here. This limited disclosure hardly constitutes a trade secret under federal law. To be a trade secret, the material must have independent economic value derived from not being generally known and the subject of efforts to maintain its secrecy." (Doc. 166-1 at PageID 6010.)

Plaintiffs' arguments and evidence in opposition did not develop a legal argument that the purported trade secrets derived any independent economic value. Plaintiffs' brief was largely silent on that issue – notwithstanding that the brief acknowledged that such value is an essential element under the DTSA. (*See* Doc. No. 193 at PageID 8695.)

Independent economic value was addressed only in the affidavit of G. Edward Alexander, the CEO of plaintiff Health Care Facilities Partners. That document is the principal evidence on which Plaintiffs rely to bring the asserted information within the ambit of the DTSA. (*See* Doc. No. 173-2.) Because that affidavit was the only articulation of independent economic value from Plaintiffs, the Court excerpts it below:

> 4.      As a part of their business, Plaintiffs regularly enter into confidential, commercially sensitive business negotiations and transactions with health systems and provider partners, the details of which are non-public. These deals derive economic value from their non-public status, particularly during the negotiations stage, as numerous other healthcare companies compete for these valuable opportunities to develop and/or manage medical facilities.
>
> 5.      Plaintiffs consider information related to their pipeline deals, including the very existence of those deals, to be their protected trade secrets. By their very nature, these pipeline deals derive economic value from their non-public status, particularly during the negotiation and pre-opening stages, as numerous other healthcare companies compete with Plaintiffs for these valuable opportunities.

---

Sandeen, *The Evolution of Trade Secret Law and Why Courts Commit Error When They Do Not Follow the Uniform Trade Secrets Act*, 33 Hamline L. Rev. 493, 525 (2010).

6.     Plaintiffs also consider information related to the centers operated and owned by them to be their protected trade secrets.  These trade secrets include information related to the contractual terms associated with the centers, the strategic plans for the centers, financial information for the centers, and information related to the physicians who practice at the centers.

7.     Plaintiffs likewise consider their pro formas, their unaudited financial statements, and information regarding the economic terms of their pipeline deals to be their protected trade secrets.

8.     Finally, the existence and terms of Plaintiffs' long-planned Joint Venture with Medical Facilities Corporation ("MFC") also constituted trade secret information that was protected by non-disclosure agreements and was not public knowledge. Such information included the very prospect that MFC was willing to combine with Plaintiffs, the financial terms of the planned joint venture, the structure of the combined joint venture, and information related to the center-specific projects that the joint venture planned to operate following the closing of that deal.

9.     I have reviewed the materials sent to Value Health on August 28, 2020, which are found in Exhibits 10, 11, 12, and 13 to the Opposition Brief . . . .  Based on my review of these materials, I understand the following:

        a.     Plaintiffs' "Member Update" presentations, found in Exhibits 11 and 12 . . . contain confidential and proprietary information including, but not limited to, the identity of Plaintiffs' healthcare partners, Plaintiffs' growth strategy, and Plaintiffs' pipeline deals.

        b.     Plaintiffs' "HCFP Overview" presentation, found in Exhibit 13 . . . contains confidential and proprietary information including, but not limited to, the identity of Plaintiffs' healthcare partners, Plaintiffs' growth strategy, and Plaintiffs' pipeline deals.

        c.     Plaintiffs "Current Projects" list, found in Exhibit 13 . . . , contains confidential and proprietary information including, but not limited to, the identity of Plaintiffs' pipeline deals and Plaintiffs' healthcare partners.

        d.     Health Care Facilities Partners, LLC's ("HCFP") and Health Care Facilities Partners Administration, LLC's ("HCFPA") Unaudited Financial Statements, found in Exhibit 13 . . . , contain HCFP's and HCFPA's confidential and proprietary information, respectively, including, but not limited to, confidential profit, loss, and debt information that Plaintiffs consider to be their trade secrets.

(Doc. No. 173-2 at PageID 7389-90 (Bates numbers omitted).)

        On summary judgment, a trade secret claimant must meet the rigors of Rule 56.  *See*

*generally R.C. Olmstead,* 606 F.3d at 276; *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F.

Supp. 3d 1274, 1300-01 (D. Utah 2020) (requiring evidence to withstand a summary judgment motion on the issue of independent economic value); *Elmagin Cap., LLC v. Chen*, 555 F. Supp. 3d 170, 180 (E.D. Pa. 2021) (holding that evidentiary submission on the issue of independent economic value sufficed to preclude summary judgment on that ground).  And a plaintiff's mere "belief in the confidentiality of its information, however fervent, does not transform that information into trade secrets."  *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 262 (S.D.N.Y. 2014), *aff'd sub nom.*, 610 F. App'x 69 (2d Cir. 2015); *cf. BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 710 (7th Cir. 2006) ("One expects a trade secret to be rich in detail, because a process described in general terms . . . will usually be widely known and thus not worth incurring costs to try to conceal and so not a trade secret.") (citations omitted).

Commentators have expressed concern that "courts essentially read 'independent economic value' out of the statute by allowing plaintiffs to rely on weak inferences and assertions of hypothetical value rather than meaningful evidence."  Camilla A. Hrdy, Mark A. Lemley, *Abandoning Trade Secrets*, 73 Stan. L. Rev. 1, 9 (2021). "[E]ven though most courts recognize the existence of the statutory requirement to prove independent economic value, in practice courts tend to ignore or downplay it.  They rely heavily on circumstantial evidence and presumptions rather than forcing trade secret plaintiffs to prove their information derives the requisite value."  *Id.* at 41.

The Ohio Supreme Court has required parties to marshal evidence in support of independent economic value.  A "conclusory statement in an affidavit of the executive director of [the company claiming a trade secret] that it 'derives potential economic value from not being generally known to, and not being readily ascertainable to, persons who can obtain economic

value from its disclosure'" was not adequate to render information a trade secret. *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000). In *Besser*, OSU claimed that preliminary business plans and pro forma financial statements were trade secrets. *Id.* at 377. Like here, an executive officer attested to the general point that the material garnered value from its secrecy. *Id.* at 400. The court acknowledged that one particular page in the asserted materials and one discrete memorandum were trade secrets, as those items listed the top performers on staff – *i.e.*, detailed the performance and ranking of professionals who competitors might try to lure away and poach if the document became public. *See id.*

But the court disagreed that any of the other materials were protected trade secrets – including staff lists, preliminary business plans, pro forma financial statements with projections, summaries of a transaction and goals, references to a proposed asset purchase agreement, description of the physical structure and dimensions of a hospital, as well as research on other hospitals. *Id.* at 378-81. The court was dismissive of what it repeatedly labeled a "conclusory affidavit," and emphasized that "there still must be evidence that the draft agreement constitutes a trade secret. OSU did not introduce sufficient evidence to establish that the draft agreement retains potential, independent economic value from not being readily ascertainable by proper means by competitors." *Id.* at 379.

> In sum, for the most part, OSU's reliance on conclusory affidavit statements is insufficient to satisfy its burden to identify and demonstrate that the records withheld and portions of records redacted are included in categories of protected information . . . . OSU did not establish that these records derived actual or potential independent economic value from not being generally known to, and not being readily ascertainable to, persons who can obtain economic value from their disclosure. For example, OSU did not introduce specific factual evidence concerning the savings effected and the value to OSU in having the information as against its competitors, the amount of effort or money expended by OSU to obtain and develop the information, and the amount of time and expense it would take for OSU's competitors to duplicate the information.

*Id.* at 381 (citations omitted).

Conclusory assurances of economic value in an affidavit were deemed inadequate in *Besser*.  There, the court looked for (and found wanting) specific evidence of facts that would demonstrate or reflect such value.  *See id.*; *see also Sun Media Sys., Inc. v. KDSM, LLC*, 564 F. Supp. 2d 946, 969-70 (S.D. Iowa 2008) (holding that bald assertions are inadequate to show independent economic value or to avoid summary judgment).  Plaintiffs' brief and supporting affidavit suffer from some of the same indeterminacy and imprecision problems that beset OSU in *Besser*.  Alexander's affidavit spoke to the ultimate legal conclusion of value derived from secrecy.  But it lacked discrete, particularized facts from his personal knowledge that lead to or substantiate the ultimate conclusion.   His affidavit confirms what he and Plaintiffs *believe* about their documents and information, but the affidavit lacks specifics to carry their Rule 56 burden on independent economic value.

Alexander's affidavit lacked detail and basically just articulated two truisms:  First, nearly every business presumes that nearly everything it does is proprietary – and so anything kept secret inures to the business's own advantage over its competitors.  Second, nearly every business would welcome *any* otherwise unknown information about any of its competitors – if only on the sheer chance of finding even a nugget of insight.  While these two beliefs may be ubiquitous in American commerce, voicing those in an affidavit cannot alone suffice to demonstrate independent economic value.  If it were otherwise, the quantum of actionable trade secrets would be vast and voluminous.

> In a general sense, there is "value" to a business in keeping all confidential business information secret; that's the motivation for classifying such information as confidential.  But just because a business benefits from keeping certain information confidential does not necessarily mean that the information has independent economic value derived from its confidentiality.  Otherwise, all confidential business information would constitute a trade secret and the additional statutory requirement that the information have independent economic value would be rendered meaningless

*Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 610-11 (E.D. Tex. 2021), *aff'd sub nom. Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023).

The Court must look for facts and evidence in the record which contain some objective indicia of (or rationale for) independent economic value derived from secrecy.  Plaintiffs did not come forward with specific facts and evidence that would substantiate a finding of independent economic value for any of the documents identified as the putative trade secrets.

In sum, there is no evidence from which a reasonable jury could conclude that the four documents referred to in Paragraph 9 of the Alexander Affidavit (exhibits 10-13), (*see* Doc. No. 173-2 at PageID 7390), meet the definition of a trade secret at Section 1839(3)(B) of the DTSA.

### 6.    Further Consideration of Plaintiffs' Purported Trade Secrets

Notwithstanding the lack of evidence demonstrating independent economic value, the Court has undertaken a review of the items Plaintiffs designated.  An examination of those materials reveals additional reasons why Diamond is entitled to judgment as a matter of law on Count II.

### a)    HCFP Member Update Presentations

The Alexander affidavit indicated that "Plaintiffs' 'Member Update' presentations contain confidential and proprietary information including, but not limited to, the identity of Plaintiffs' healthcare partners, Plaintiffs' growth strategy, and Plaintiffs' pipeline deals."  (Doc. No. 173-2 at ¶ 9(a).)  "Plaintiffs also consider information related to the centers operated and owned by them to be their protected trade secrets.  These trade secrets include information related to the contractual terms associated with the centers, the strategic plans for the centers, financial information for the centers, and information related to the physicians who practice at the centers," the Alexander affidavit explained.  (*Id.* ¶ 6.)  "Plaintiffs protect the confidentiality

of their trade secrets.  For instance, Plaintiffs routinely mark their proprietary, confidential documents with a confidentiality stamp and otherwise indicate the confidentiality of those documents in their electronic file names."  (*Id.* ¶ 12.)

Plaintiffs did not submit evidence upon which a jury could find that these two documents were or contain trade secrets.  There was no 'Confidential' stamp on these two documents, nor was there any evidence showing confidentiality or secrecy in the file name for the electronic versions of the documents.  There was no evidence showing that Plaintiffs issued any nondisclosure agreement or warning with these two items.  Although Alexander described general practices by which Plaintiffs kept information confidential, (*see, e.g.,* Doc. No. 193 at PageID 8698 n.92), there was no evidence to substantiate that those practices were employed with respect to these two update documents.

"Mere speculation will not suffice to defeat a motion for summary judgment: '[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate.'"  *Griffin v. Jones*, 170 F. Supp. 3d 956, 963 (W.D. Ky. 2016) (quoting *Monette v. Electronic Data Systems Corp*., 90 F.3d 1173, 1177 (6th Cir. 1996)).  In *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010), the Sixth Circuit affirmed the entry of summary judgment against a trade secret claimant who failed to marshal evidence showing steps to maintain the secrecy of the material in question.  *See id.* at 276-77.

There is simply no evidence showing measures to keep member updates secret – much less any evidence regarding these two updates in particular.  Accordingly, there is no evidence from which a reasonable jury could conclude that the member updates in Exhibits 10  and 12 (Doc. No. 195-4 at PageID 8864-67; Doc. No. 195-2 at PageID 8780-83) meet the definition of a

trade secret at Section 1839(3)(A) of the DTSA.

### b)    Overview Presentation

The Alexander affidavit indicated that "Plaintiffs' "HCFP Overview" presentation . . .

contains confidential and proprietary information including, but not limited to, the identity of

Plaintiffs' healthcare partners, Plaintiffs' growth strategy, and Plaintiffs' pipeline deals."  (Doc.

No. 173-2 at ¶ 9(b).)  "Plaintiffs protect the confidentiality of their trade secrets.  For instance,

Plaintiffs routinely mark their proprietary, confidential documents with a confidentiality stamp

and otherwise indicate the confidentiality of those documents in their electronic file names,"

Alexander confirmed.  (*Id.* ¶ 12.)  The Overview Presentation is found at Doc. No. 195-5 at

PageID 9036-46

Notably, the vast majority of this information is publicly available on HCFP's website,

including services HCFP provides, a list of the management team, and photographs of past

projects.  Mr. Alexander conceded as much in his deposition.  (Doc. No. 166-2 at PageID 6055

(Q: "In fact, this is something you might actually have on your web page at some point in time

when you're talking about how good HCFP can be, true?  A. That is true.").)  Mr. Alexander also

conceded that past projects are not confidential, and he would not seek a non-disclosure

agreement to protect such information.  (*Id.* at PageID 6059.)

Plaintiffs did not submit evidence upon which a jury could find that this document was or

contains trade secrets.  There was no 'Confidential' stamp on the HCP Overview document, nor

was there any evidence showing confidentiality or secrecy in the file name for the electronic

version of the document.  There was no evidence showing that Plaintiffs issued any

nondisclosure agreement or warning with respect to the Overview in particular.  Although

Alexander described general practices by which Plaintiffs kept information confidential, (*see,*

*e.g.*, Doc. No. 193 at PageID 8698 n.92), there was no evidence to substantiate that those practices were employed with respect to this Overview document. *See R.C. Olmstead*, 606 F.3d at 276-77.

There is no evidence showing measures to keep the Overview secret. Accordingly, there is no evidence from which a reasonable jury could conclude that the Overview meets the definition of a trade secret at Section 1839(3)(A) of the DTSA.

### c)    Current Project List

The Alexander Affidavit indicated that Plaintiffs 'Current Projects' list, (Doc. No. 195-5 at PageID 9054), "contains confidential and proprietary information including, but not limited to, the identity of Plaintiffs' pipeline deals and Plaintiffs' healthcare partners." (Doc. No. 173-2 at ¶ 9(c).)

Unlike the Updates and Overview discussed above, this document was marked "CONFIDENTIAL – FOR DISCUSSION PURPOSES ONLY – DO NOT FORWARD OR CONTACT PROJECT." (Doc No. 195-5 at PageID 9054.) Accordingly, the Court presumes that Plaintiffs might satisfy the statutory definition in Section 1839(3)(A) of the DTSA. However, different problems are present in the small chart listing ten (10) "Current Projects," which the Court discusses below.

Plaintiffs referred to two types of content in this document that each present quite different rationales for potential trade secret protection: pipeline deals and current healthcare partners. (Doc. No. 173-2 at ¶ 9(c).) According to the Alexander Affidavit:

> Plaintiffs consider information related to their pipeline deals, including the very existence of those deals, to be their protected trade secrets. By their very nature, these pipeline deals derive economic value from their non-public status, particularly during the negotiation and pre-opening stages, as numerous other healthcare companies compete with Plaintiffs for these valuable opportunities.

> Plaintiffs also consider information related to the centers operated and owned by them to be their protected trade secrets. These trade secrets include information related to the contractual terms associated with the centers, the strategic plans for the centers, financial information for the centers, and information related to the physicians who practice at the centers.

(Doc. No. 173-2 at PageID 7389 ¶¶ 5-6.)

Between the two, Plaintiffs' rationale for protection of pipeline deal information is more persuasive. But which, *if any*, of the ten items in the chart in question were still "pipeline" deals remains unclear because Plaintiffs' submissions never indicated. Another court's remark in a trade secret case befits the Current Projects List here: "Even now, the putative trade secret is notable for its imprecision." *Big Vision*, 1 F. Supp. 3d at 263. Neither the Alexander Affidavit nor the content of the chart distinguishes the 10 items in the chart between pipeline opportunities and existing business partnerships which were products of consummated transactions.

Again, Mr. Alexander defined "pipeline deals" to mean those in the pre-opening negotiation stage. But there is no evidence to show that the ten surgical facilities on the list were still in that pre-opening negotiation phase. (Doc. No. 173-2 at PageID# 7389.) It is literally impossible on this evidentiary record to discern whether the reference to "pipeline deals" was an accurate description of any of the lines in this chart – or instead was merely a makeweight for trade secret protection. *Cf. Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 CIV. 9292 (DLC), 2008 WL 463884, at *9 (S.D.N.Y. Feb. 20, 2008) ("Plaintiff continued its Dance of the Seven Veils approach to the trade secret claim in its brief in opposition to defendants' motion for summary judgment, persisting in its resistance to explaining fully the basis for its trade secret claim."). "Courts may grant summary judgment on trade secret misappropriation claims when plaintiffs do not sufficiently identify their purported trade secrets." *Elmagin Cap.*, 555 F. Supp. 3d at 177; *see also Caudill Seed*, 53 F.4th at 381 (finding "trade secret must be defined with reasonable particularity" (citation and quotation omitted)); *R.C. Olmstead,* 606 F.3d at 276; *Givaudan*

*Fragrances Corp. v. Krivda*, 639 F. App'x 840 (3d Cir. 2016) (finding summary judgment proper where plaintiff "failed to provide enough specific information" about the trade secret at issue).

In addition, the chart shows that for all ten entities, a special purpose entity for the management services already had been created.  (Doc. No. 195-5 at PageID 9054.)  The existence of established special purpose entities would suggest that these locations had moved beyond pipeline deals and were active, established business affiliations.  Because Plaintiffs put forward no evidence to substantiate which, if any, of the ten locations listed were pipeline deals, there was no basis for a jury to conclude as much.

That means the only possible evidence-supported ground for trade secret protection for the Current Projects List would have to rest in the "information related to centers operated and owned" by Plaintiffs.  (Doc. No. 173-2 at PageID 7389 ¶ 6.)  As to those, Alexander indicated that the "trade secrets include information related to the contractual terms associated with the centers, the strategic plans for the centers, financial information for the centers, and information related to the physicians who practice at the centers."  (*Id.*)

But here is the problem with Alexander's affidavit: *none* of the above categories of information were listed or disclosed in the Current Projects List.  Put differently, what Alexander said were considered trade secrets regarding existing business relationships were indisputably not contained in the chart for which Plaintiffs now claim trade secret protection.

The Court also observes that Plaintiffs' creation of special purpose entities itself detracts from the notion that they cautiously keep their existing business relationships or locations secret.  As evidenced by the list of plaintiff entities in the Amended Complaint, each time Plaintiffs take on a new management and/or investment role, they create an LLC typically with "HCFP" in the

name along with the city or town where the medical facility is located.  If Plaintiffs wanted to keep their role or affiliation circumspect for a local surgical center in say Celebration, Florida, then the Court is surprised to see that Plaintiffs created entities as matters of public record titled "HCFP of Celebration Enterprises, LLC."  Creating entities to explore opportunities that bear the name of the cities where their surgical centers will be located cuts against Plaintiffs' secrecy argument.

Simply stated, affording all inferences in Plaintiffs' favor, there is not evidence from which a reasonable jury could conclude that the Current Projects List was a trade secret.

### d)    Financial Statements

Plaintiffs also claimed trade secret protection for two documents containing unaudited preliminary financial statements.  (Doc. No. 193 at PageID 8695.)  These documents were shared by Diamond in late August 2020.  (*See* Doc. 195-5 at PageID 8871.)

The first document contained an unaudited preliminary financial statement for Health Care Facilities Partners, LLC dated February 28, 2018.  (Doc. No. 195-5 at PageID 9048-9053.) By August 2020, "the financial statement was two years old, obviously stale."  *In re Benton*, 367 B.R. 592, 599 (Bankr. S.D. Ohio 2006).  Courts recognize that "obsolete information cannot form the basis for a trade secret claim because the information has no economic value."  *Fox Sports Net N., L.L.C. v. Minnesota Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003); *see also CH Bus Sales, Inc. v. Geiger,* No. 18-CV-2444, 2019 WL 1282110, at *9 (D. Minn. Mar. 20, 2019).[4]

---

[4] Federal courts are reluctant to afford Rule 26(c) protective orders to "business information that is substantially out of date." *JTS Choice Enters., Inc. v. E.I. Du Pont De Nemours & Co.,* No. 11-CV-03143, 2013 WL 791438, at *4 (D. Colo. Mar. 4, 2013).  "While staleness of the information sought to be protected is not an absolute bar to issuance of an [protective] order, it is a factor which must be overcome by a specific showing of present harm."  *Q-Tech Labs. Pty Ltd. v. Walker*, No. 01-CV-1458, 2002 WL 1331897, at *15 (D. Colo. June 4, 2002) (quoting *Deford v. Schmid Prods. Co., a Div. of Schmid Labs., Inc*., 120 F.R.D. 648, 654 (D. Md. 1987)).  "[H]ard

There was no evidence, argument, or legal theory from Plaintiffs showing how or why this two-year-old information could still garner independent economic value by virtue of its secrecy. Given the absence of evidence to explain how this financial performance information still would merit trade secret protection for more than two years after the time period reflected in the document, the Court holds that Plaintiffs have not made a requisite showing to withstand Rule 56. There is no evidence from which a reasonable jury could conclude that the February 2018 preliminary financial statement still derived value from secrecy and thereby could be protected under the DTSA.

That leaves one document remaining for which Plaintiffs claimed trade secret protection: an unaudited preliminary financial statement for Health Care Facilities Partners Administration, LLC dated May 31, 2020. (Doc. No. 195-5 at PageID 9030-9035.) As a threshold matter, the document was labeled confidential. The Court thus presumes that Plaintiffs took reasonable precautions to maintain the secrecy of the document.

The Alexander Affidavit indicated that Plaintiffs "consider their pro formas, their unaudited financial statements, and information regarding the economic terms of their pipeline deals to be their protected trade secrets." (Doc. No. 173-2 at ¶ 7.) The two documents identified in Plaintiffs' papers included "HCFP's and HCFPA's confidential and proprietary information, respectively, including, but not limited to, confidential profit, loss, and debt information that

---

and fast rules in this area are inappropriate. Frequently the injury that would flow from disclosure is patent, either from consideration of the documents alone or against the court's understanding of the background facts. The court's common sense is a helpful guide. An attempt to show that disclosure will indeed work a competitive disadvantage might be undermined if the information sought to be protected were stale." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 891 (E.D. Pa. 1981); *Momentive Specialty Chemicals, Inc. v. Alexander*, No. 2:13-CV-275, 2013 WL 2287091, at *4 (S.D. Ohio May 23, 2013) ("If such information is outdated, it may be deserving of lesser protection.").

Plaintiffs consider to be their trade secrets." (*Id.* at 9(c).)

There can be cases where a claimant's evidence will substantiate and justify the assertion of trade secret protection for financial statements. For example, in *Boehm v. Black Diamond Casino Events, LLC*, 116 N.E.3d 704, 708 (Ohio Ct. App. 1st Dist. 2018), the trade secret claimant showed with testimony and other evidence how financial statements were kept secret and the nature of how those derived economic value. *See id.* Plaintiffs' submissions here do not contain the sort of evidentiary showings on key questions that were made in *Boehm*.

This case is closer to *Brown v. Sperber-Porter*, No. CV-16-02801-PHX-SRB, 2017 WL 11482463 (D. Ariz. Dec. 8, 2017), where the claimant relied on "conclusory arguments." *Id.* at *5. The basic financial information in that case was held not to rise to the level of a trade secret – even though the court recognized that different financial records might justify trade secret protection if supported by evidence demonstrating that the financial records revealed more sensitive information or valuable information that had been compiled by the owner, such as market research. *See id.*

Similarly instructive is *Squiric v. Surgical Hosp. at Southwoods*, 2020-Ohio-7026, 2020 WL 8093202, at *1 (Ohio Ct. App. 7th Dist. Dec. 23, 2020), where a hospital sought "to protect certain financial documents, including financial statements and profit and loss reports, arguing they should have been exempted from discovery as confidential trade secrets. The hospital's affidavit did not contain a detailed explanation of the economic impact of disclosure." *Id.* The Ohio Court of Appeals explained:

> We tend to agree with the trial court's judgment indicating that the affidavit was too conclusory to demonstrate that the financial information derives actual or potential independent economic value by being not easily ascertainable by those who can benefit financially from it as required by R.C. 1333.61(D)(1). The affiant said disclosure of the financial information would leave the hospital open to attack from competitors without explaining how this would occur. The court is left to

speculate as to the fears of the hospital and create our own scenarios for how the secretive nature of annual financial statements and profit and loss statements has independent economic value due to being secret from unknown others.  Plus, the unknown others must be able to "obtain economic value" from the release of the information, and the hospital has not explained how this would occur.

*Id.* at *16.  The trial court "viewed the feared economic harm to the hospital as speculative and unsupported.  The potential harm was vague and not self-evident."  *Id.* at *17 (citation omitted).  Plaintiffs' evidentiary submissions here were deficient in ways like what the court described in *Squiric.*

A fundamental problem with Plaintiffs' position is that it rests implicitly on a generic proposition that financial statements will merit protection.  But a court cannot indulge such a presumption for trade secrets, as another state court once reasoned:

> A business is either profitable or it is not.  The Trade Secrets Act seeks to protect those ideas, information, processes, etc. that gives the enterprise profitability, not the fact that it is profitable.  The fact that the enterprise is profitable has no independent economic value.

*Atl. Med. Specialists, LLC v. Gastroenterology Assocs., P.A.*, No. CV N15C-06-245, 2017 WL 1842899, at *9 (Del. Super. Ct. Apr. 20, 2017).   Never in their briefings or in the Alexander Affidavit do Plaintiffs pinpoint specific portion(s) of the financial information that would be peculiarly harmful if disclosed or that would devolve economic value on a third party.

There may be situations where a court can ascertain grounds for trade secret protection mainly from the face of a financial statement.  For example, if financials contain narrative notes that plot out a company's future strategy, reflect legal advice, or explain guidance protected by an accountant's privilege, then the face of such document itself may satisfy certain aspects of the DTSA.  But the rudimentary financial statement identified here does not qualify.  (*See* Doc. No. 195-5 at PageID 9030-35.)  Plaintiffs' supporting evidence in the Alexander Affidavit is conclusory and lacks specifics.

There is no evidence from which a reasonable jury could conclude that the two financial statements identified, (Doc. No. 195-5 at PageID 9030-35 & 9048-9053), meet the definition of a trade secret at Section 1839(3) of the DTSA.

### e)      Information about the Joint Venture

Finally, Plaintiffs argued that Diamond disclosed information about the Joint Venture to Value Health.  (Doc. No. 193 at PageID 8696.)  Plaintiffs contend that this potential transaction qualifies as a trade secret and that the terms of the Joint Venture were protected by a confidentiality agreement.  (*Id.*)  To demonstrate that Diamond disclosed such information, Plaintiffs relied on the fact that the sale price between Diamond and Value Health reflected the same valuation used in the potential joint venture.  (*Id.*; *see also* Rolfe Dep., Doc. No. 173-20 at PageID 7510-15; Doc. No. 173-26.)

Plaintiffs claim here fails for lack of particularity.  "Courts may grant summary judgment on trade secret misappropriation claims when plaintiffs do not sufficiently identify their purported trade secrets."  *Elmagin Cap.*, 555 F. Supp. 3d at 177; *see also Givaudan*, 639 F. App'x at 845  (finding summary judgment proper where plaintiff "failed to provide enough specific information" about the trade secret at issue); *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) (finding "trade secret must be defined with reasonable particularity" (citation and quotation omitted)).

Plaintiffs' theory is that Diamond disclosed information resulting in a price point akin to that contemplated by Plaintiffs' joint venture.  But Plaintiffs must explain what precisely was the information related to the joint venture that they urge should be deemed a trade secret.  Plaintiffs offered no evidence indicating what trade secret information Diamond purportedly disclosed. Plaintiffs did not submit email communications indicating that Diamond disclosed the terms of

the joint venture or testimony indicating how Diamond and Value Health reached the same number offered by the investor.

"Circumstantial evidence can be used to establish a misappropriation of trade secrets, but only after enough specific information has been given to the accused party so they can defend what it is they are accused of stealing.  Inferences drawn from circumstantial evidence cannot be used to substantiate bald assertions."  *Givaudan*, 639 F. App'x at 846.  As to the joint venture, Plaintiffs asked the Court to rely on their bald assertion that Diamond disclosed information regarding the joint venture based solely on the circumstantial evidence that the valuation was the same.  This is insufficient to allow the Court define and announce particular information as comprising a trade secret.

There is no evidence from which a reasonable jury could identify and find that information about the joint venture met the definition of a trade secret at Section 1839(3) of the DTSA.

### C.     Declaratory Judgment Claim

Ohio courts are best suited to address what may be an issue of first impression, *i.e.,* whether unanimity was required among the members of an LLC organized under Ohio law – prior to the April 12, 2021 effective date of Ohio Rev. Code § 1706.082(A) – to amend an operating agreement that is silent on the issue.  *Cf. Dudley v. Dudley*, 2009-Ohio-1166, 2009 WL 683702, at *3 (Ohio Ct. App. 12th Dist. 2009).  Accordingly, the Court DECLINES to resolve the declaratory judgment claim in Count I of the Complaint, which is dismissed without prejudice.

**D.     Supplemental Jurisdiction**

Federal law provides:

The district courts may decline to exercise supplemental jurisdiction over a claim . . . if –

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

"A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims.  That discretion, however, is bounded by constitutional and prudential limits on the use of federal judicial power. . . .  When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (citations omitted); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  Courts will consider factors such as –

the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice. . . . The doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988) (cleaned p).

This Court has disposed of the federal claim over which it had original jurisdiction.  *See*

28 U.S.C. § 1367(c)(3).  The state law claims that remail raise novel and complex issues of Ohio law.  The Ohio courts are best suited to decide whether Diamond's actions constitute legal malpractice or some other tort.  Those decisions may be appealed to the Ohio Supreme Court, which would be the body that would resolve issues of professional responsibility for members of the Ohio bar.

The Court DECLINES to exercise supplemental jurisdiction over the remaining state law claims and counterclaims, all of which are dismissed without prejudice.

**III.**   **Conclusion**

Summary judgment is entered in favor of Diamond on Count II of Plaintiffs' Amended Complaint.  The Court declines to exercise jurisdiction over the remaining claims, all of which are dismissed without prejudice.

**IT IS SO ORDERED.**

Date:   June 5, 2023

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE